LILLIAN REIS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reis v. Commissioner
Docket No. 3171-70.
United States Tax Court
T.C. Memo 1974-287; 1974 Tax Ct. Memo LEXIS 32; 33 T.C.M. (CCH) 1333; T.C.M. (RIA) 740287; November 11, 1974, Filed. *32 Held, deficiencies determined in petitioner's income taxes for the years 1959 through 1965 by application of cash expenditures method with additions for specific items. Held, further, the understatement in income for each of the years 1959 through 1965 was due to fraud within the meaning of sec. 6653(b) and petitioner, therefore, is liable for the fraud penalties. In addition, petitioner is liable for the additions determined under sec. 6654 for the years 1959, 1961, 1962 and 1965 for underpayment of the estimated tax. James Vernile and Robert F. Simone, for the petitioner. Alan E. Cobb, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined the following deficiencies in income tax and additions thereto against petitioner: Additions to Tax
Year
Deficiency
Sec. 6653(b) [1]
Sec. 6654 1959
$ 11,094.64
$ 5,547.32
$ 308.77
1960
27,161.09
13,580.55
-
1961
3,862.30
1,931.15
105.69
1962
1,697.22
848.61
43.18
1963
3,590.24
1,795.12
93.27
1964
1,880.04
940.02
45.39
1965
2,072.56
1,036.28
50.78
The principal issues for our determination are: (1) whether petitioner had any unreported taxable income *33 for the years 1959 through 1965, and if so, (2) whether any part of the underpayment of income tax by petitioner for any of the years 1959 through 1965 was due to fraud within the meaning of section 6653(b). In making a determination with respect to the former issue a determination must be made as to whether respondent properly applied the cash expenditures method in determining petitioner's income for the years in question. In addition, if deficiencies are found but it is determined that respondent did not sustain his burden of proof with respect to the issue of fraud for any of the years in question, then we must also make a determination as to whether assessments of any of the deficiencies are barred by the statute of limitations. We must also determine whether petitioner is liable for the additions to tax for underpayment of the estimated tax under section 6654 for the years 1959 and 1961 through 1965. FINDINGS OF FACT Petitioner Lillian Reis, sometimes known as Lillian Corabi, resided in Philadelphia, Pa., at the time of the filing of her petition with this Court. For the taxable years 1959, 1961, 1962 and 1965 petitioner failed to file income tax returns. For the taxable *34 years 1960, 1963 and 1964 petitioner filed separate income tax returns with the district director of internal revenue in Philadelphia. The 1960 return was filed on May 2, 1961, 17 days late. The 1963 return was filed on June 16, 1965, one year and 62 days late. The 1964 return was also filed on June 16, 1965, 62 days late. With respect to years when no returns were filed, petitioner offered no excuse except she believed returns were filed. A statutory notice of deficiency setting forth the alleged deficiencies in income tax and additions thereto was mailed to petitioner on March 5, 1970. The issuance of this notice of deficiency resulted from an investigation by internal revenue agent John B. Sweeney. Since petitioner failed to keep any records of her income for the years 1959 through 1965, agent Sweeney employed the cash expenditures method with additions for specific items in his attempt to determine petitioner's income for the years in question. [2] Petitioner *35 began a career in show business, primarily as a dancer, in 1946 at the age of 16. In 1949, after engagements in Florida, California and New York, she came to Philadelphia and was booked into the Latin Casino, then a reputed big-name night club. She had accumulated approximately $ 12,000 in cash by this time. This accumulation resulted primarily from gifts from a certain gentleman friend in Florida. Petitioner remained at the Latin Casino until mid-1950 and then obtained employment at the Celebrity Room, another Philadelphia night club. Petitioner found the club unique and was desirous of eventually buying it. However, it was not until 1960 that petitioner was successful in purchasing the club. In 1952 petitioner married Michael Corabi. Subsequent thereto petitioner and her husband put up $ 10,000 of petitioner's money as a deposit with the intention of becoming a third owner of the Celebrity Room. This arrangement fell through primarily because of a conflict between petitioner and her husband, and the money was returned and put into petitioner's safe-deposit box at the Broad Street Trust Company in Philadelphia. Petitioner continued to be employed at the Celebrity Room. Between *36 1949 and 1954 petitioner accumulated over $ 15,000 in cash. Besides the funds kept in the safe-deposit box, the rest of her funds were kept either at her mother's home or at her home in Philadelphia. Petitioner claimed inconvenience as the primary reason for not depositing her funds in a bank. In 1954 a gentleman by the name of Clyde (Bing) Miller came to the Celebrity Room and took a fancy to petitioner. The evening Mr. Miller came into the club he invited all of the people in the show to join him at a table and offered to buy them steak dinners and champagne. Petitioner was in this group and after awhile began to notice that everybody was receiving $ 50 bills to leave the table so that petitioner finally was alone with Mr. Miller. When the end of the night came Mr. Miller's check totalled $ 800. This was in addition to the various bills Mr. Miller had already passed out. As petitioner was getting ready to leave Mr. Miller said he had something special for her and he began looking for his checkbook. Unable to find it, Mr. Miller asked the then owner of the club for a blank check and then asked petitioner how much to write it for. Petitioner, in disbelief, said to make it *37 out for $ 1,200 for a mink stole. Petitioner then asked to have one made out in the same amount for her sister also. After making out another check Mr. Miller left. The next morning petitioner took the checks to a furrier and to her surprise found that they were valid. Mr. Miller returned to the club that night with additional gifts for petitioner and a lasting friendship developed between the two.
As a result, petitioner started receiving various sums of money and other gifts from Miller on a regular basis until mid-1959. Specifically, from 1954 until mid-1959 Mr. Miller paid all of petitioner's living expenses and in addition gave her approximately $ 200 a week in cash. These expenses included clothing, jewelry, charge accounts, doctor bills, general household and living expenses, furniture, appliances, a car, $ 2,000 for her brother's bar mitzvah, $ 3,000 to least the upstairs bar at the Celebrity Room, and $ 10,000 to invest in a night club in the summer of 1959. Petitioner, as a result of these gifts, claims she had accumulated over $ 100,000 in cash by 1959. This $ 100,000 petitioner claims she spent by 1965. Between 1954 and mid-1959 petitioner saw Mr. Miller every Tuesday *38 night at the Celebrity Room and Wednesday afternoons from approximately 1:00 p.m. to 3:00 p.m. These afternoon encounters occurred at various places including supermarkets, a girl friend's apartment and hotels where Mr. Miller was staying. Of the alleged $ 100,000 accumulation petitioner and her husband counted out $ 29,500 at her home in 1958. In addition, petitioner had $ 12,000 at her mother's house and some other funds located in the safe-deposit box at the Broad Street Trust Company. During 1959 Mr. Miller came upon bad times and was sent to jail for a few months for passing bad checks. After Mr. Miller went to jail an individual by the name of Ralph Staino, Jr., started paying all of petitioner's living expenses. Mr. Staino also insisted that petitioner stop seeing Mr. Miller. For the years 1952 through 1958 petitioner and her husband filed joint income tax returns with petitioner reporting the following amounts as gross income on the returns: Year
Gross Income 1952
$ 2,160.00
1953
-0-
1954
-0-
1955
641.65
1956
2,026.62
1957
1,812.19
1958
1,283.16
On May 22, 1958, the partners of Philadelphia Motor Company recovered a default judgment of $ 325.26 against petitioner in the Municipal Court *39 of Philadelphia. The judgment was based upon a failure to pay for the balance due on the car Mr. Miller gave petitioner and for certain repair work. Petitioner denied knowledge of the suit and claimed she owed nothing.The car was repossessed. On February 10, 1958, petitioner's husband borrowed $ 600 from the American Loan Company in Philadelphia. Petitioner's name was on the note but petitioner did not sign it and was unaware of the loan. On June 20, 1958, there was a default judgment on the loan against petitioner and her husband. Petitioner was unaware of the judgment. On June 9, 1959, another default judgment was entered against petitioner in the amount of $ 3,690.09 in favor of Wikler and Martin for furniture purchased for petitioner by Mr. Miller. Petitioner claimed that Wikler and Martin breached their contract and that she believed Mr. Miller eventually paid them off. Petitioner was unaware of the judgment.
In 1958 petitioner applied for a loan of $ 2,000 from the Broad Street Trust Company but the application was rejected. During 1959 petitioner worked for the Bon Bon Club in Philadelphia and the Celebrity Room, earning $ 1,432.88 from the former and $ 3,000 from the *40 latter. During that summer Mr. Miller gave petitioner $ 10,000 for the purpose of purchasing the Bon Bon Club. However, petitioner heard that the Celebrity Room was for sale. As a result the Bon Bon Club was not purchased and petitioner retained the $ 10,000 given to her by Mr. Miller. As to the actual purchase of the Celebrity Room, the facts are unclear. Apparently a corporation, Reis Enterprises, Inc., was formed to make the acquisition and petitioner purchased the club through the corporation in 1960. It is not clear what interest petitioner had in the corporation. The corporation also opened bank accounts with a total opening balance of approximately $ 5,000. Petitioner's father was interested in the purchase and he put up $ 15,000. This $ 15,000 was eventually put down in late 1959 as a deposit for the purchase of the club. The agreed purchase price for the club was $ 40,000, and for the stock, liquor and inventory approximately $ 3,500. Petitioner furnished the remaining $ 25,000 due on the purchase of the club at the time of settlement in January 1960. This $ 25,000 resulted from a loan petitioner obtained from the Broad Street Trust Company by putting up $ 25,000 *41 of her own funds as collateral. Petitioner borrowed the $ 25,000 instead of making direct payment on the advice of attorneys. Apparently it was easier to obtain a liquor license under this method. The Liquor Control Board before granting a license makes an investigation as to source of funds and credibility. During the investigation by the Liquor Control Board petitioner told the investigator that the only assets she had were her mortgaged home and $ 350 in the bank. At the time of purchase in 1960, petitioner paid $ 3,500 for the liquor, stock and inventory and $ 4,800 as advance rent in 1960. Petitioner also put up $ 2,500 to cover the salary of the opening performer, Myron Cohen and loaned the corporation an additional $ 5,000. Turning for a moment to petitioner's father's role in the purchase, petitioner determined that her father did not have the time to participate in the club and so, not wanting to keep his money tied up, she returned to him $ 12,000 in late 1960 or early 1961. This $ 12,000 had been kept at her parents' home for a number of years. On August 25, 1960, petitioner and Ralph Staino, Jr., among others, were indicted by a grand jury in Schuylkill County, *42 Pa., for burglary and larceny. The burglary for which petitioner was charged as having been a participant occurred on August 7, 1959, and estimates of the amount of money stolen ranged from $ 3,000 up to almost $ 500,000. The money apparently was never recovered. Petitioner's trial was held in the Court of Common Pleas of Schuylkill County in Pottsville, Pa., in October 1961. On October 18, 1961, the jury disagreed on the verdict and was discharged. Petitioner was retried and found guilty on April 14, 1964. On December 18, 1967, a motion for a new trial was granted. On March 9, 1970, the Court of Common Pleas granted the district attorney leave to file a petition to nolle prosequi the proceeding and such petition was granted on March 17, 1970. Judge John E. Lavelle represented petitioner at her first trial in Pottsville and his fee was $ 4,800. The fee was paid in the following installments: $ 1,000 in cash in August 1960; $ 200 in November 1960; $ 1,000 by check in April 1961 (this check was returned for insufficient funds but was subsequently made good); two $ 500 checks sometime in 1961; $ 1,300 in April 1961; $ 500 in May 1961; and final payments of $ 100 and $ 700 in *43 October 1961. In addition $ 185 to cover miscellaneous costs was paid in October 1961 and $ 700 was paid sometime in early 1961 for transcripts of a related trial involving the burglary. During 1960 petitioner obtained a $ 10,000 bail bond from one Joseph Nardello and Nardello was paid $ 750. During 1961 petitioner obtained another $ 10,000 bail bond and a $ 15,000 bail bond from Nardello and he was paid $ 750 for the $ 10,000 bond and $ 325 on the $ 15,000 bond. At the time of trial there was still $ 800 due on the $ 15,000 bond. Apparently the payments were made in installments and Nardello would pick up his payments at the Celebrity Room usually from Ralph Staino, Jr. In 1961 or 1962 William J. Krencewicz and Johanna Zerbe Martz, attorneys in Schuylkill County, also represented petitioner and were paid $ 2,500 in cash by courier. Petitioner lost ownership in the Celebrity Room in mid-1963, after the club had been closed because of alleged liquor violations. In 1964 petitioner put up $ 800 for a deposit on an apartment in Florida.Petitioner shared the apartment with Mr. Staino and her two children with Mr. Staino paying the $ 300 per month rent. In 1965 Stephen Feldman, an *44 attorney for petitioner, recovered a $ 5,000 judgment for punitive damages from a libel suit instituted on behalf of petitioner. Mr. Feldman deducted $ 3,219.11 for fees and paid the balance to Robert Simone, petitioner's attorney in this case. Also in 1965 petitioner received $ 3,000 from a benefit given in her home for her years in show business. Turning now to the specific years in issue, respondent, with certain modifications on our part, properly determined that the following expenditures were made by petitioner or on her behalf: 1959
1960
1961
1962
Food and Groceries
$ 1,800.00
$ 1,800.00
$ 1,800.00
$ 1,800.00
Beauty Parlor
50.00
50.00
50.00
50.00
Dry Cleaning
50.00
50.00
50.00
50.00
Doctor, Dentist, Opticians
100.00
100.00
100.00
100.00
Medicine, Drugs
50.00
50.00
50.00
50.00
Transportation
300.00
300.00
300.00
300.00
Cigarettes and Cosmetics
100.00
212.50
100.00
100.00
Electricity
252.00
252.00
252 .00
252.00
Gas
252.00
252.00
252.00
252.00
Telephone
420.00
420.00
420.00
420.00
Amusements and Liquor
360.00
300.00
300.00
300.00
Vacation - Atlantic City [1] *46 1,500.00
-
-
-
Mortgage Payments [2]
1,181.28
1,321.17
1,281.00
1,252.72
Rug Deposit
1,000.00
-
-
-
T.V. and Dining Room Deposit
200.00
-
-
-
Installment payments [3]
390.00
390.00
390.00
390.00
Baby Sitter
1,300.00
1,300.00
1,300.00
1,300.00
Celebrity Room [4]
1,500.00
40,800.00
-
-
F.I.C.A. Tax 75.00
144.00
85.50
46.88
-
Philadelphia Wage Tax
45.00
85.50
46.31
24.38
Judge Lavelle
-
1,200.00
4,485.00
-
Joseph Nardello
-
750.00
1,075.00
-
Young Development Co.
-
500.00
-
-
Charities
-
100.00
-
-
Federal Withholding
-
798.00
-
-
Krencewicz-Martz
-
-
2,500.00
-
Piano
-
-
-
785.00
Clothing
-
-
-
413.22
Labor
-
-
-
-
Costumes and Accessories
-
-
-
-
Makeup
-
-
-
-
Music
-
-
-
-
Hairdresser
-
-
-
-
Wigs
-
-
-
-
Photos and Publicity
-
-
-
-
Agent
-
-
-
-
Union Dues
-
-
-
-
Legal Fees
-
-
-
-
Bail Bond
-
-
-
-
Travel Expenses
-
-
-
-
Miami Apartment Deposit
-
-
-
-
William Thompson (bail bond)
-
-
-
-
Steve Feldman
-
-
-
-
Florida Bail Bond
-
-
-
-
Florida Court Costs
-
-
-
-
Petitioner's Father [5]
-
12,000.00
-
-
TOTAL
$ 10,925.28
$ 63,175.17
$ 14,836.81
$ 7,886.20
*45 1963
1964
1965
Food and Groceries
$ 1,800.00
$ 1,800.00
$ 1,800.00
Beauty Parlor
50.00
50.00
50.00
Dry Cleaning
50.00
50.00
50.00
Doctor, Dentist, Opticians
100.00
100.00
100.00
Medicine, Drugs
50.00
50.00
50.00
Transportation
300.00
300.00
300.00
Cigarettes and Cosmetics
100.00
100.00
100.00
Electricity
252.00
252.00
252.00
Gas
252.00
252.00
252.00
Telephone
420.00
420.00
420.00
Amusements and Liquor
300.00
300.00
300.00
Vacation - Atlantic City [1]
-
-
-
Mortgage Payments [2]
1,241.08
1,149.60
1,259.47
Rug Deposit
-
-
-
T.V. and Dining Room Deposit
-
-
-
Installment payments [3]
390.00
-
-
Baby Sitter
1,300.00
1,300.00
1,300.00
Celebrity Room [4]
-
-
-
F.I.C.A. Tax 75.00
-
-
Philadelphia Wage Tax
-
-
-
Judge Lavelle
-
-
-
Joseph Nardello
-
-
-
Young Development Co.
-
-
-
Charities
-
-
-
Federal Withholding
-
-
-
Krencewicz-Martz
-
-
-
Piano
-
-
-
Clothing
562.45
-
-
Labor
1,010.00
-
-
Costumes and Accessories
400.00
351.00
-
Makeup
100.00
-
-
Music
40.00
125.00
-
Hairdresser
150.00
-
-
Wigs
300.00
-
-
Photos and Publicity
200.00
-
-
Agent
240.00
-
-
Union Dues
50.00
-
-
Legal Fees
250.00
-
-
Bail Bond
150.00
-
-
Travel Expenses
2,680.00
-
-
Miami Apartment Deposit
-
800.00
-
William Thompson (bail bond)
-
1,125.00
-
Steve Feldman
-
-
3,219.11
Florida Bail Bond
-
-
500.00
Florida Court Costs
-
-
700.00
Petitioner's Father [5]
-
-
-
TOTAL
$ 12,737.53
$ 8,524.60
$ 10,652.58
Exclusive of prior cash on hand and funds made available to petitioner by Mr. Miller and Mr. Staino, respondent properly determined that petitioner received the following funds during the years in question: 1959
1960 Bon Bon Club
$ 1,432.88
Reis Enterprises, Inc.
$ 5,700
South Pacific Club
3,000.00
Tax Refund
168.40
$ 5,700
$ 4,601.28
1961
1962 Reis Enterprises, Inc.
$ 2,850.00
Reis Enterprises, Inc.
$ 1,500
Tax Refund
259.65
Conshohocken [3] *47 400
Ephrata [4]
400
$ 3,100.65
$ 2,300
1963
1964 Entertainer and Dancer [5]
$ 4,600.00
Entertainer and Dancer
$ 700
$ 4,600.00
$ 700
1965
Punitive Damages [6]
$ 5,000.00
Whiskey Go-Go
1,400.00
Palumbo's [7]
3,000.00
$ 9,400.00
Respondent properly determined that petitioner had the following business expenses: Year
Amount 1963
$ 5,570
1964
476
During the years in question petitioner paid the following amounts of interest and city real estate taxes: Year
Interest
Taxes 1959
$ 576.78
$ 262.96
1960
564.30
278.16
1961
551.24
288.80
1962
537.59
288.80
1963
523.30
326.80
1964
466.44
344.00
1965
492.76
344.00 Respondent properly determined that petitioner is entitled to the following amounts for itemized deductions: [8]
Year
Amount 1959
$ 884.74
1960
1,027.96
1961
886.35
1962
850.77
1963
850.10
1964
810.44
1965
4,055.87
Petitioner is also entitled to an exemption of $ 600 for herself and additional exemptions of $ 600 for each of her two children, Barbara and Michael, for the years in question. During the years petitioner filed income tax returns, *48 the following amounts of taxable income were reported on the returns: Year
Reported Taxable Income 1960
$ 2,701.68
1963
-0-
1964
-0-
Prior to the expiration of the time prescribed by section 6501(a) for the assessment of income tax due from petitioner for the year 1960, petitioner and respondent executed an agreement in writing pursuant to section 6501(c) (4) extending the period for assessments of tax due for 1960 to December 31, 1964. The extended date for assessment of tax for the year 1960 was further extended under subsequent agreements in writing executed by petitioner and respondent on December 1, 1964; October 21, 1965; September 14, 1966; September 5, 1967; September 12, 1968; and July 31, 1969, which subsequent agreements consecutively extended the period of limitations for assessments to June 30, 1970. The statutory notice of deficiency setting forth respondent's determination of petitioner's income tax liability was sent to petitioner by certified mail on March 5, 1970, which date was prior to the expiration of the period for assessments for 1960. Finally, during the course of the investigation, agent Sweeney asked petitioner various questions regarding the source of some of *49 her funds. In response petitioner told agent Sweeney to see the Bing Miller testimony in the transcript of the first Pottsville trial. These questions were with regard to the gifts from Mr. Miller petitioner claims to have received. Agent Sweeney never read this part of the transcript nor tried to get in contact with Mr. Miller or Mr. Staino. [9]
We have been unable to determine the exact amount of funds given to petitioner by Mr. Miller and Mr. Staino. However, substantial funds were given to petitioner by Mr. Miller and some funds given by Mr. Staino. Neither Mr. Miller nor Mr. Staino testified at this hearing. Apparently neither could be located. During the course of the investigation petitioner was cooperative and did not attempt to conceal anything from agent Sweeney. OPINION We note first that petitioner kept little, if any, records during the years in issue. When a taxpayer fails to keep appropriate records as required by section 6001 and the regulations thereunder, the Commissioner is fully justified in making assessments based on other available *50 evidence provided the amounts determined are not arbitrary or unreasonable. (C.A. 6, 1957). In this instance respondent reconstructed petitioner's income through the use of the cash expenditures method with the addition of specific items. This method has received judicial approval. ; (C.A. 3, 1962). The cash expenditures method is not a method of accounting. It is simply an acceptable means of determining income where other reliable data are not available. [10]
When the Commissioner resorts to the cash expenditures method of reconstructing income he must meet the requirements established for its use in . See also In Holland we note the following requirement for the use of this method: an essential condition in cases of this type is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future *51 increases in the taxpayer's assets. The importance of accuracy in this figure is immediately apparent, as the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset. * * * [.] The cash expenditures method is explained in (C.A. 3, 1952). In that case the following was pointed out: The theory of it is simple, though its application may become difficult. It starts with an appraisal of the taxpayer's net worth situation at the beginning of a period. He may have much or he may have nothing. If, during that period, his expenditures have exceeded the amount he has returned as income and his net worth at the end of the period is the same as it was at the beginning (or any difference accounted for), then it may be concluded that his income tax return shows less income than he has in fact received. * * * [.] Turning to the issue of petitioner's net worth at the beginning of 1959, petitioner contends that she had over $ 100,000 and that this was primarily as a result of gifts from Mr. Miller.
Respondent, on the other hand, contends that petitioner had only $ 350 on *52 hand at the beginning of 1959. Respondent bases this contention upon petitioner's 1959 statements to the state liquor control board investigator that she had only $ 350. After a careful review of the record, we are of the opinion that petitioner had $ 41,500 at the beginning of 1959. We believe that petitioner and her husband in fact counted out $ 29,500 at petitioner's home in 1958. We also believe that in fact petitioner had left $ 12,000 at her parents' home sometime prior to 1958 and that this $ 12,000 was not removed until 1960 when it was given to petitioner's father. Petitioner also testified that she kept funds in the Broad Street Trust Company; but while there may have been $ 10,000 in there around 1954, petitioner has failed to demonstrate the amount, if any, kept at the trust company at the beginning of 1959. We find that petitioner has failed to substantiate anything over $ 41,500. We can find no rational basis for respondent's claim of $ 350. While it is apparent that petitioner was not truthful to the liquor license investigator, respondent's use of the $ 350 figure does not follow. While petitioner told the investigator that she had only $ 350, the evidence *53 is clear that petitioner had at least the $ 25,000 put up as collateral for the loan to complete the purchase of the Celebrity Room in 1960. In determining the validity of the $ 41,500 figure we have taken into consideration the evidence contrapositive to the evidence presented by petitioner to demonstrate an accumulation, i. e., we have considered, among other othings, the evidence of default judgments against petitioner and the circumstances surrounding these judgments, the fact petitioner made many payments on an installment basis, the fact funds were not kept at a bank, the rejected loan application, petitioner's correspondence with Judge Lavelle, and her conduct in certain other transactions. However, when all the evidence is weighed, we believe it is a reasonable conclusion that petitioner had $ 41,500 at the beginning of 1959. Having so determined that petitioner had $ 41,500 at the beginning of 1959, we next turn to the application of the cash expenditures method with additions for specific items to the years in issue. We note at the outset that while this is a fraud case and burden of proof as to the issue of fraud is upon the respondent, see section 7454(a), petitioner *54 bears the burden of disproving the amount of the deficiencies. Unfortunately, petitioner has not favored us with a written brief. Consequently, we cannot determine all the objections petitioner may have to respondent's requested findings; nor do we have the advantage of petitioner's comments on several items the Court suggested petitioner cover on brief. However, we have attempted to discern from the record petitioner's position on the various issues presented where practical. In applying the cash expenditures method it is also necessary that respondent show either a likely source of currently taxable income, , or negate nontaxable sources of income such as gifts. . Respondent contends that a likely source of currently taxable income is the Pottsville burglary and petitioner's earning capacity as an entertainer. We do not disagree with respondent as to the existence of these likely sources. Petitioner, on the other hand, contends that she had nontaxable sources of income, i.e. that she was the recipient of cash and other gifts from Bing Miller and Ralph Staino, Jr., during the years in issue. While Bing *55 Miller was not called as a witness apparently because he could not be located, agent Sweeney was aware of this possible source of income but did not follow up this lead. Agent Sweeney had a duty to follow up this lead. While we would prefer corroborating testimony, we believe that petitioner in this instance has met her burden by a preponderance of the evidence of showing that she received various cash and other gifts from Mr. Miller from 1954 up until mid-1959. Respondent then contends that even if we find that these payments were made, they were not gifts but taxable income. We disagree. While respondent puts emphasis on petitioner being available to Mr. Miller, we find that there was sufficient donative intent and no expectation of a quid pro quo. [11] *56 See . While we are unable to determine with exactitude the amount of gifts Bing Miller made to petitioner, we believe he in fact gave petitioner $ 10,000 to invest in a night club during the summer of 1959 and paid for her living expenses for half of 1959. With respect to the payments received by petitioner from Ralph Staino, Jr., we reach a different conclusion. While we reject respondent's claim that the payments were taxable income and not gifts, we find that petitioner, except in certain instances, has not substantiated to our satisfaction the amount of most of these gifts. In addition this lead was not furnished to agent Sweeney. We shall now reconstruct petitioner's income for the years in issue using respondent's method with our modifications. For 1959 we find as follows: Funds available
Bon Bon Club
$ 1,432.88
South Pacific Club
3,000.00
Tax Refund
168.40
Cash on hand [12]
29,500.00
Mr. Miller:
Atlantic City Vacation
1,500.00
Night Club Investment
10,000.00
Household Expenses [13] *57 3,000.00
$ 48,601.28
Expenditures
$ 10,925.25
Of the above amounts we find that the following were income to petitioner for 1959: Bon Bon Club
$ 1,432.88
South Pacific Club
3,000.00
$ 4,432.88
Since petitioner failed to file a return for 1959, we find that petitioner had $ 4,432.88 of unreported income for 1959. For 1960 we find as follows: Funds available
Reis Enterprises, Inc.
$ 5,700.00
Cash on hand:
$ 48,601.28
-10,925.25
37,676.03
Cash at parents' home
12,000.00
$ 55,376.03
Expenditures
$ 63,175.17
In recapping the above we find that petitioner had the following income for 1960: Cash expenditures method:
Expenditures
$ 63,175.17
Funds available
55,376.03
$ 7,799.14
Reis Enterprises, Inc.
5,700.00
$ 13,499.14
On petitioner's return for 1960 she reported income of $ 5,700. We find that petitioner had $ 7,799.14 of unreported income for 1960. For 1961 we find the following: Funds available
Reis Enterprises, Inc.
$ 2,850.00
Tax Refund
250.65
$ 3,100.65
Expenditures
$ 14,836.81
We find that petitioner had the following income for 1961: Cash expenditures method:
Expenditures
$ 14,836.81
Funds available
3,100.65
$ 11,736.16
Reis Enterprises, Inc.
2,850.00
$ 14,586.16 Since petitioner failed to *58 file a return for 1961, we find that petitioner had $ 14,586.16 of unreported income for 1961. For 1962 we find as follows: Funds available
Reis Enterprises, Inc.
$ 1,500.00
Conshohocken performance
400.00
Ephrata performance
400.00
$ 2,300.00
Expenditures
$ 7,886.20
We find that petitioner had the following income for 1962: Cash Expenditures method:
Expenditures
$ 7,886.20
Funds available
2,300.00
$ 5,586.20
Reis Enterprises, Inc.
1,500.00
Conshohocken performance
400.00
Ephrata performance
400.00
$ 7,886.20
Since petitioner failed to file a return for 1962, we find that petitioner had $ 7,886.20 of unreported income in 1962. For 1963 we find as follows: Funds available
Entertainer and dancer
$ 4,600.00
Expenditures
$ 12,737.53
We find that petitioner had the following income for 1963: Cash expenditures method:
Expenditures
$ 12,737.53
Funds available
4,600.00
$ 8,137.53
Entertainer and dancer
$ 4,600.00
Less business expenses
5,570.00
(970.00)
$ 7,167.53
Petitioner reported no income on her 1963 return. We, therefore, find that petitioner had $ 7,167.53 of unreported income in 1963. For 1964 we find as follows: Funds available
Entertainer and dancer
$ 700.00
Expenditures
8,524.60
We find that petitioner had the following *59 income for 1964: Cash expenditures method:
Expenditures
$ 8,524.60
Funds available
700.00
$ 7,824.60
Entertainer and dander
$ 700.00
Less business expenses
476.00
224.00
$ 8,048.60
Petitioner reported income of $ 224 on her 1964 return. We, therefore, find that petitioner had $ 7,824.60 of unreported income for 1964. For 1965 we find as follows: Funds available
Punitive Damages Recovery
$ 5,000.00
Whiskey Go-Go
1,400.00
Palumbo's Benefit
3,000.00
$ 9,400.00
Expenditures
$ 10,652.58
We find that petitioner had the following income for 1965: Cash expenditures method:
Expenditures
$ 10,652.58
Funds available
9,400.00
$ 1,252.58
Punitive Damages Recovery
5,000.00
Whiskey Go-Go
1,400.00
$ 7,652.56
Since petitioner failed to file a return for 1965, we find that petitioner had $ 7,652.56 of unreported income for 1965. We leave for the Rule 155 computation the determination of the corrected taxable income for each of the years and the various deficiencies attributable thereto. We note that in our findings of fact we have listed the itemized deductions and personal exemptions allowable.
While it is possible that petitioner may have had additional sources of nontaxable income during the years in issue which would have lowered *60 the amount of her unreported income for the years in issue, the fact remains that she bore the burden of proving such sources. Except where indicated, she has not met that burden. In some instances respondent was unable to offer direct proof that petitioner herself made all the cash expenditures which we have found. We are of the opinion that whether a payment is made directly by petitioner or by a third party to satisfy an obligation of petitioner, the payment in either event represents income to petitioner unless she can establish that the payments were gifts. See . As previously noted, this she has not done except in the situations already mentioned. We are now left with the issue of whether respondent properly determined that the underpayment in income tax by petitioner for each of the years 1959 through 1965 was due to fraud within the meaning of section 6653(b). The issue of fraud is a question of fact to be determined upon consideration of the entire record. . The burden of proof is upon respondent to show fraud through clear and convincing evidence.Section 7454(b); *61 (C.A. 7, 1965). Respondent must establish fraud separately for each year involved before the penalty for that year can be sustained. . To establish fraud by direct proof of intention is seldom possible. It usually must be gleaned from the conduct of the taxpayer and the circumstances in question. . The required quantum of proof may be satisfied by circumstantial evidence. (C.A. 7, 1972); . After a careful review of the record, we are of the opinion that respondent has sustained his burden of proof on the issue of fraud by clear and convincing evidence for each of the years in question. While the mere failure to report income, considered alone, is not indicative of fraud, the consistent failure to report substantial amounts of income over a period of years is effective evidence of a fraudulent intent. (C.A. 3, 1947); Petitioner in this instance failed to report substantial amounts of income over a seven-year period and gave no reasonable *62 explanation for this failure to report. Such repeated omissions without satisfactory expanation, accordingly, are not mere omissions. Moreover, where such omissions result from a failure to keep adequate records, the indication of fraud is strengthened. ; cf. . Here petitioner presented no records at all. The above evidence alone is enough to support a finding of fraud for each of the years in question. In addition there is other evidence of fraud. Petitioner's failure to file returns for the years 1959, 1961, 1962 and 1965 without reasonable explanation supports an inference of an intention of income tax evasion for those years. (C.A. 3, 1963). While we note that willful failure to file a return does not of itself establish fraud, (C.A. 3, 1968), certiorari denied, , here we believe that the circumstances surrounding the failure to file strongly and unequivocally indicate an intention to avoid the payment of a tax believed or known to be owing for these years. We, therefore, find that petitioner *63 is liable for the additions to tax prescribed by section 6653(b) for each of the years 1959 through 1965. Respondent has also determined that petitioner is liable under section 6654 for additions to tax for underpayment of the estimated taxes for the years 1959 and 1961 through 1965. Petitioner has offered no proof with respect to this issue. Consequently, we find that petitioner is liable for such additions except for those additions determined for 1963 and 1964. Since petitioner filed returns for those years, we have no jurisdiction over the determination of such additions. See section 6659(b) (2). Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended. ↩
2. Because of the nature of this method of reconstruction of income, it is necessary to summarize petitioner's history prior to the years in issue. We shall also highlight petitioner's history during the years in issue. ↩
1. We find that this vacation was paid for Mr. 2. The listed amounts include payments for principal, interest, tax escrow, and any late payment charges. ↩
3. We have determined that the installment payments ended in 1963. ↩
4. We are of the opinion that the only expenditure made by petitioner in 1959 for the Celebrity Room was a deposit of $ 1,500.00 into the corporate bank accounts of Reis Enterprises, Inc. The $ 15,000.00 down payment was made by petitioner's father through petitioner. ↩
5. For the purpose of this computation we have assumed that petitioner's father was repaid $ 12,000 of his investment ment in 1960, not 1961. As our opinion will demonstrate, whether the repayment occurred in 1960 or 1961 does not affect the deficiencies for those years. ↩
1. We find that this vacation was paid for by Mr. Miller. ↩
3. Payment for a one-night performance in Conshohocken, Pa. 4. Payment for a one-night performance in Ephrata, Pa. ↩
5. Payments petitioner received as entertainer and dancer. ↩
6. Received as a result of favorable judgment in libel suit. ↩
7. Gift from benefit given for petitioner. ↩
8. We note that some adjustments in these figures may be necessary, e.g., medical deductions, but we leave these adjustments for the Rule 155 computation. ↩
9. Petitioner had also alleged that Mr. Staino gave her gifts and paid her expenses after Miller went out of the picture in 1959. ↩
10. Cf. , affd. per curiam (C.A. 3, 1965), certiorari denied . ↩
11. In making this finding we have considered the remarks in . We have also considered the fact that petitioner met Mr. Miller on a regular basis and petitioner's statement that she earned every penny of the gifts. With respect to that statement we believe petitioner adequately explained what she meant by the statement at the trial. 12. While we determined that petitioner had $ 41,500 at the beginning of 1959, $ 12,000 remained at her parents' home and was not used in 1959. ↩
13. Determined under the Cohan rule, (C.A. 2, 1930).